IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

SHAWN ASA ASHBY,                          )
         Plaintiff,                    )
                                  )
v.                                        )            CIVIL ACTION NO. 2:14-00674
                                  )
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social Security,   )
         Defendant.                    )

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433,

1381-1383f. By Standing Order entered January 14, 2014 (Document No. 4.), this case was referred

to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to

submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C.

§ 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on

the Pleadings (Document Nos. 10 and 16.) and Plaintiff's Reply. (Document No. 17.)

      The Plaintiff, Shawn Asa Ashby (hereinafter referred to as "Claimant"), filed applications

for DIB and SSI on September 29, 2010 (protective filing date), alleging disability as of September

12, 2010, due to problems with knees, back, left leg, carpal tunnel, and depression. (Tr. at 11, 140-

42, 61, 66, 143-50, 175, 178.)  The claims were denied initially and upon reconsideration. (Tr. at 47-

50, 61-63, 66-68, 74-76, 81-83.) On April 28, 2011, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 72-73.) A hearing was held on August 27, 2012, before the

Honorable Jon K. Johnson. (Tr. at 29-46.)   By decision dated September 13, 2012, the ALJ

determined that Claimant was not entitled to benefits. (Tr. at 11-23.) The ALJ's decision became

the final decision of the Commissioner on November 14, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on, January 8, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

2

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph © of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, September 12, 2010. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "chronic cervical and lumbar strain, degenerative arthritis, carpal tunnel syndrome with history of right release, and obesity," which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary level work, except he could not push or pull with the upper extremities. (Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 21, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as an order clerk, a surveillance system monitor, and a cashier, at the unskilled, sedentary level of exertion. (Tr. at 21-22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 22, Finding No. 11.)

5

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on February 1, 1976, and was 36 years old at the time of the administrative hearing, August 27, 2012. (Tr. at 21, 33, 140, 143.) The ALJ found that Claimant had a general equivalency diploma and was able to communicate in English. (Tr. at 21, 34, 177, 179.) In the past, he worked as an auto mechanic and a boilermaker. (Tr. at 21, 36-37, 44, 179.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence, and discusses it below in relation to Claimant's arguments.

Paul A. Dunn, Ph.D. - Consultative Psychological Examination:

On January 4, 2011, Dr. Dunn conducted a consultative psychological examination at the request of the state agency. (Tr. at 261-68l.) Dr. Dunn noted that Claimant drove himself to the examination and arrived 25 minutes early. (Tr. at 261.) His grooming and hygiene were within normal limits. (Id.) Claimant reported problems with his knees, back, and left leg, carpal tunnel syndrome ("CTS"), and depression. (Tr. at 263.) He began having significant problems working in 2005, due to pain. (Id.) Claimant scored a 44 on the Beck Depression Inventory, which suggested significant signs and symptoms of depression. (Tr. at 263.) Claimant reported that he slept on average four hours per night, was tired during the day and occasionally napped, had an increased appetite, and had situational anxiety regarding bills, child support, and household repairs. (Id.) Claimant reported that he was not taking any medications due to a lack of funds and was attempting to obtain a medical card. (Tr. at 264.)

On mental status exam, Dr. Dunn noted that Claimant's motor activity was very slowed and his energy was very low, he had a flat affect and depressed mood, rapport was not easily established and he was withdrawn, he was cooperative but seemed mistrustful of the process, he exhibited an accent and slur to his speech and spoke in a low volume that made it difficult to understand, his verbal fluency was below average, and he was not well oriented. (Tr. at 264.) Dr. Dunn noted an absence of thought disorder but that Claimant tended to obsess upon his physical symptoms and pain condition, he denied any hallucinations, his concentration and judgment were within normal limits, his immediate memory was within normal limits, his recent and remote memory was moderately deficient, his persistence was normal, and his pace and social functioning were mildly deficient. (Tr. at 264-65.) Dr. Dunn noted Claimant's activities to have included napping, visiting his parents in their home, doing laundry, picking up toys, going out and running errands with his wife at the store

and other places, occasionally helping his wife clean the house, talking with his children, and watching television. (Tr. at 265.)

Dr. Dunn diagnosed major depressive disorder, single episode, moderate; and pain disorder associated with both psychological factors and a general medical condition, and assessed a GAF of 65. (Tr. at 265-66.) He noted that Claimant's most prominent disorder was depression, and that it was at a moderate level, but "it does not seem to have a significant effect on his functioning but rather than pain condition, by his report, seems to have more of an effect." (Tr. at 266.) He opined that Claimant's prognosis was guarded depending on his treatment of the pain disorder and some reduction in the depression through treatment. (Id.) He further opined that Claimant was capable of managing his benefits. (Id.)

Rosemary L. Smith, Psy.D. - Psychiatric Review Technique & Mental RFC Assessment:

On January 14, 2011, Dr. Smith, a state agency psychologist, completed a form Psychiatric Review Technique, on which she opined that Claimant's depression and pain disorder resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 269-83.) In reaching her opinion, Dr. Smith reviewed Dr. Dunn's consultative evaluation report. (Tr. at 281.) Dr. Smith noted that although Dr. Dunn concluded that Claimant's concentration was not limited significantly, she believed that his pain disorder would cause limitations in that area. (Id.) On her form Mental RFC Assessment, Dr. Smith assessed moderate limitations in Claimant's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 284-86.) In all other functional areas, Dr. Smith opined that Claimant was not significantly limited. (Id.) She further opined that Claimant

retained the "ability to learn and perform simple, unskilled work-like activities in an environment that involves limited contact with others." (Tr. at 286.) On April 1, 2011, Dr. James W. Bartee, Ph.D., another state agency psychologist, affirmed Dr. Smith's opinions as written. (Tr. at 288.)

Jeffrey W. Garvey, D.C. - Parkersburg Chiropractic Clinic:

Claimant presented to Dr. Garvey on June 10, 2010. (Tr. at 247-48.) Dr. Garvey indicated his positive physical exam findings to have included that Claimant complained of mid and low back pain on examination and that cervical and lumbar range of motion was reduced. (Tr. at 248.). On October 6, 2010, Dr. Garvey referenced radiological findings, which included osteoarthritis and vertebral subluxations. (Tr. at 250.) Dr. Garvey provided Claimant with a note that he be excused from work until further notice. (Tr. at 249.) On a form provided by the West Virginia Department of Health and Human Resources, Dr. Garvey identified that his last contact with Claimant was November 19, 2010, and indicated that his employment limitation was that he was unable to lift more than ten pounds, was unable to bend over, or reach out. (Tr. at 351.) He opined that Claimant's prognosis was poor to fair and that he was able to care for children under the age of six. (Id.)

Stephen Nutter, M.D. - Consultative Evaluation:

On December 20, 2010, Dr. Nutter conducted a consultative medical examination at the request of the state agency, for complaints of back and joint pain. (Tr. at 254-60.) Claimant reported a 12 to 14 year history of back pain and an unknown cause of neck pain of the same duration. (Tr. at 254.) He described the back pain as constant that radiated down both legs. (Id.) The neck pain also was constant and radiated down the right arm, and was located in the lumbar, cervical, and thoracic areas. (Id.) The back pain was aggravated by bending, sitting, standing, lifting, vibration, coughing, or sneezing. (Id.) The neck pain was aggravated by tuning his head and rapid head movement. (Id.) Chiropractic therapy helps the pain. (Id.) He reported a seven year history of joint pain in the hands,

wrists, right elbow, shoulders, hips, knees, and right ankle. (Id.) He described the pain as constant and was made worse by standing, walking, kneeling, squatting, and climbing up and down stairs. (Id.) He reported that his knees gave out and sometimes caused him to fall. (Id.) He also reported hand numbness. (Id.) Claimant reported headaches that occurred all the time, which caused nausea, vomiting, and photophobia. (Tr. at 255.) He rated them at a level 9 out of 10. (Id.)

On physical examination, Dr. Nutter observed that Claimant ambulated with a normal gait without assistive devices, and that his neck exam was unremarkable. (Tr. at 255.) Claimant's right shoulder exam revealed pain with movement and tenderness and his left shoulder had tenderness. (Tr. at 256.) Claimant had some decreased range of right elbow motion. (Id.) Exam of his hands was unremarkable. (Id.) Examination of the knees showed pain with movement and tenderness and decreased range of motion due to pain. (Id.) Dr. Nutter noted pain on range of cervical spine motion testing and tenderness of the paravertebral muscles. (Tr. at 257.) He also had back pain with lumbar spine range of motion testing and tenderness to palpation of the paraspinal muscles. (Id.) Straight leg raising test was normal and Claimant was able to stand on one leg without difficulty. (Id.) Sensation was intact, he was able to walk on his toes, and he could perform tandem gait without difficulty. (Id.) He was unable to squat due to pain. (Id.) He had some muscle weakness. (Id.)

Donna Shanholtzer, C-FNP - Roane County Family Health Care:

On March 7, 2011, Claimant presented to Roane County Family Health Care for follow-up evaluation of cold symptoms. (Tr. at 354-55.) He also reported for initial evaluation of insomnia and stated that due to his inability to sleep, he had been hunting from dusk until 2:00 a.m. (Tr. at 354.) Ms. Shanholtzer noted that he probably had situational depression. (Id.) Claimant also reported that he was pursuing disability due to degeneration of the cervical spine. (Id.) On physical exam, Ms. Shanholtzer observed that Claimant was pleasant and cooperative and had a normal mood and affect.

(Tr. at 354-55.) She assessed insomnia associated with anxiety, depression and tenosynovitis of the hand/wrist. (Tr. at 355.) She counseled him on depression and anxiety awareness and prescribed Vistaril and Celexa. (Id.)

Claimant returned on March 28, 2011, and reported that the medication was helping a little bit. (Tr. at 356-57.) On April 6, 2011, Claimant reported that he felt better with Celexa. (Tr. at 358-59.) Ms. Shanholtzer continued his medications. (Tr. at 359.)

Marcel Lambrechts, M.D. - Case Analysis:

On April 5, 2011, Dr. Lambrechts, a state agency medical consultant, reviewed the medical RFC of record, which indicated light exertion, and noted that there were no new reports that would change the decision originally made. (Tr. at 290.)

Ruth Ann Full, PAC - Wirt County Health Services Association:

Claimant presented to PAC Full on February 14, 2011, as a new patient, and reported that he had been taken off work eight months ago by his chiropractor due to back pain. (Tr. at 292-95.) He reported chronic pain in his back, knees, and wrist, and indicated that he had surgical repair with metal fixation of his right lower leg in the 1990s following a motor vehicle accident. (Tr. at 292.) Claimant reported that he exercised moderately three times a week and previously worked as a mechanic and wanted to return to work when better able to function. (Tr. at 292, 295.)

Physical examination revealed that Claimant's back was normal, that his cervical spine range of motion was intact, his motor strength was normal, his grip strength was 4/5, and she noted paresthesias in both hands, he had crepitus in both knees with flexion and extension, his sensation was intact, and he was able to toe and heel walk. (Tr. at 294.) She noted that Claimant's gait and stance were normal. (Id.) PAC Full assessed lumbago, ganglion of the wrists, myalgia and myositis, prescribed medications, and noted that he may need an EMG to rule out carpal CTS. (Tr. at 294-95.)

On May 13, 2011, Claimant was seen on follow-up and complained of intermittent numbness and tingling, and stiffness of both hands, and indicated that he had some difficulty grasping and holding objects. (Tr. at 408-11.) On exam, he had a positive Tinel's sign bilaterally in his hands and PAC Full referred him to a neurologist for an EMG. (Tr. at 410-11.) She also referred him to a gastroenterologist for rectal bleeding. (Tr. at 411.)

On July 26, 2011, Claimant reported that he had carpal tunnel repair on his right wrist and x-rays and injections on his bilateral knees, which provided relief. (Tr. at 404-07.) He continued to complain of back pain, but noted that he was seeing Dr. Davis at the pain clinic for his complaints. (Tr. at 404.) Claimant reported that he was depressed. (Tr. at 405.) On physical exam, PAC Full noted that his gait and stance were normal. (Tr. at 406.) She assessed GERD, arthralgias in multiple sites, and depression. (Id.) She advised him to stop Celexa and start Cymbalta. (Tr. at 407.) On August 12, 2011, Claimant reported anxiety and depression but denied sleep disturbances, and PAC Full noted that his behavior demonstrated psychomotor agitation. (Tr. at 400-01.) His mood was euthymic and his affect was congruent with his mood. (Tr. at 401-02.) She assessed major depression, single episode with psychotic features, and recommended that he use stress balls to increase gradually the strength in his right hand and wrist. (Tr. at 402.) On August 26, 2011, PAC Full referred Claimant for general surgery regarding his hemorrhoids and rectal bleeding. (Tr. at 395-98.) On December 2, 2011, Claimant was seen on a three-month follow-up. (Tr. at 387-90.) He reported that he continued to work as a mechanic and that his joint and low back pain persisted, but was manageable. (Tr. at 387.) He reported depression and sleep disturbances. (Tr. at 387-89.) PAC Full observed that his gait and station were normal. (Tr. at 389.) She assessed benign essential hypertension, abdominal pain, hyperlipidemia, and arthralgias in multiple areas. (Tr. at 390.)

On January 12, 2012, PAC Full assessed fatigue as adverse affects from Ambien. (Tr. at 380-

82.) On May 23, 2012, Claimant reported chronic low back pain and indicated that he previously tried physical therapy but was unable to complete it. (Tr. at 372-75.) He indicated that he continued regular chiropractic treatment, non-steroidal anti-inflammatory drugs, and Tramadol. (Tr. at 372.) She observed that his gait and stance were normal. (Tr. at 374.) She referred him for additional physical therapy and increased his Tramadol. (Tr. at 375.)

Donna Davis, D.O. - Mountaineer Pain & Relief Rehabilitation:

Dr. Davis saw Claimant on June 1, 2011, as a new patient. (Tr. at 307-09.) He was referred by Camden Clark Emergency Room for back pain and right knee pain. (Tr. at 307.) Claimant reported that he had been off of work since last September due to low back pain. (Id.) He stated that the Tramadol and Flexeril had helped until three or four days ago when he awoke with severe pain. (Id.) He reported difficulty moving and participating in daily activities due to pain. (Id.) Claimant reported that he was in a motorcycle wreck in 1994, and broke 12 bones and had a rod in his left leg. (Id.)

On physical examination, Dr. Davis noted pain with extension and rotation of his cervical spine; normal upper extremity range of motion; normal muscle strength and sensation; complaints of tenderness diffusely of the lumbosacral region; negative straight leg raising; normal lower extremity muscle strength; and mildly limited hip range of motion. (Tr. at 308.) Dr. Davis assessed low back, thoracic, and bilateral knee pain. (Id.) She ordered x-rays, prescribed a trial of Rybix, increased Flexeril, and advised against injections until after his scheduled colonoscopy. (Id.)

The x-rays of Claimant's knees on June 1, 2011, showed no evidence of acute fracture, a chronic fracture of the left tibia that had been internally fixated with a long rod, bilateral bipartite patellae, and mild degenerative changes involving the right knee mostly medially where there was narrowing and spurring. (Tr. at 310.) The x-rays of his lumbar spine and sacroiliac joints were

13

normal. (Tr. at 311-12.)

On June 15, 2011, Claimant complained of tenderness in the lumbosacral region on examination. (Tr. at 306.) Dr. Davis noted that straight leg raising was negative, strength was normal, and sensation was intact. (Id.)

George Herriott, M.D. & Jay D. Wilson, PAC - Parkersburg Orthopedics Associates:

Claimant was examined by PAC Wilson, at the request of PAC Full, on July 12, 2011, for complaints of bilateral knee pain and bilateral numbness and tingling of the hands. (Tr. at 313-15.) PAC Wilson noted on physical exam that Claimant had a positive Tinel's sign of the median nerve of the bilateral wrists. (Tr. at 314.) He also had crepitus of the bilateral knees, tenderness to palpation, and he had full range of motion. (Id.) A nerve conduction study revealed mild bilateral CTS. (Id.) The x-rays of the knees revealed bilateral medial joint space narrowing that is mild/moderate, associated with spurring. (Tr. at 315.) Claimant was given a corticosteroid injection in the knees and was scheduled for right CTS release. (Id.) Dr. Herriott performed the right CTS release on July 13, 2011. (Tr. at 327-28.) On July 22, 2011, it was noted that Claimant had full range of his wrists and hands. (Tr. at 317-18.)

On August 18, 2011, PAC Wilson noted Claimant's reports of weakness in his right thumb and increased pain of the bilateral knees. (Tr. at 319.) On examination, Claimant had full range of hand and wrist motion, though painful abduction of the right thumb was noted to the palmar aspect of the right thumb base. (Tr. at 320.) The x-rays of the hands showed mild/moderate spurring of the first CMC joint. (Id.) He was assessed with localized primary osteoarthritis of the carpometacarpal joint of the right thumb and was given an injection. (Id.) PAC Wilson also administered the first of three Hyalgan injections to Claimant's knees. (Id.) Claimant however, did not return for the second injection due to family health issues. (Tr. at 320, 321.)

On October 5, 2011, Claimant reported that his knees were "giving away." (Tr. at 321.) On examination, his knees were tender to palpation, though he had full range of motion. (Tr. at 321-22.) A McMurray test was positive. (Tr. at 321.) PAC Ryan S. Gilliand assessed osteoarthritis of the knee with internal derangement of the medial meniscus on the right. (Tr. at 322.) An MRI of the right knee on October 12, 2011, revealed a longitudinal tear of the posterior horn of the lateral meniscus with some edema and fluid suggesting a more acute-subacute injury, mild tricompartmental osteoarthritis, and small knee joint effusion. (Tr. at 349-50.) On October 14, 2011, PAC Gilliand noted Claimant's reports of right ankle pain with a one week history. (Tr. at 323-24.) Claimant reported that he was upset and kicked something. (Tr. at 323.) He also requested the second Hyalgan injection of the bilateral knees. (Id.) On examination, Claimant had tenderness on palpation of the anterior aspect of his ankle, but normal range of motion. (Id.) PAC Gilliand reviewed the knee MRI results, which suggested a complete tear of the anterior cruciate ligament, prominent thinning of the articular cartilage and degeneration of the meniscus both medially and laterally. (Tr. at 324.) He assessed sprain of the ankle. (Id.)

On October 25, 2011, Claimant presented for his third Hyalgan injection in both knees and also complained of pain at the base of his left thumb. (Tr. at 325-26.) He reported that he feared having CTS release on the left because he had it done on the right and now had weak grip and it flared up the OA he had in the CMC joint of his right thumb. (Tr. at 325.) On exam, PAC Gilliand noted that CRT of the left thumb was positive and that although motion was not limited in the left thumb, his CMC joint was painful. (Id.) X-rays of the left hand revealed minimal degenerative changes of the CMC joint of the left thumb. (Id.)

Claimant presented to PAC Gilliand on April 25, 2012, for an Euflexa injection in the bilateral knees. (Tr. at 343-44.) Claimant reported that his right hand fell asleep while driving and

15

at night, but did not mention his left hand. (Tr. at 343.) Physical exam revealed positive Tinel's sign of the right median nerve. (Id.) PAC Gilliand recommended an EMG, but Claimant declined. (Tr. at 344.) Claimant had his second and third Euflexa injections on May 2, 2012, and May 9, 2012. (Tr. at 345-46.)

Mountain River Physical Therapy:

Claimant was referred to Mountain River Physical Therapy by Dr. Davis, where she underwent physical therapy from June 22, 2011, through July 18, 2011 (Tr. at 298-305.), and then later from June 19, 2012, through June 26, 2012. (Tr. at 427-36.) On June 22, 2011, it was noted that Claimant wanted to resume his activities such as hunting, riding his four-wheeler, and returning to work. (Tr. at 298.) He presented with signs of symptom magnification. (Tr. at 299.) On June 24, 2011, it was noted that Claimant had limited tolerance to mobilization of lumbar spinous processes. (Tr. at 301.) On June 29, 2011, Claimant reported that his back felt fine, with no complaints after the last treatment. (Tr. at 302.) It was observed that he had grass clippings on the lower portion of his legs with grass stains on his shoes. (Id.) He continued to demonstrate some tenderness to superficial palpation of his low back. (Id.) Claimant reported increased soreness in his lumbar and thoracic spine on July 6, 2011, and indicated that he was stiff. (Tr. at 303.) He continued to have limited tolerance to mobilization of the lumbar spinous processes. (Id.) On July 11, 2011, Claimant reported that he felt better after mechanical traction the last time but reported pain at the base of his shoulder blades. (Tr. at 304.) He was given a home TENS unit. (Id.) On July 18, 2011, Claimant's wife reported that he had been standing at the hospital all day due to his father's illness. (Tr. at 305.) On June 26, 2012, Claimant reported that his back was sore because he sat on the bleachers to watch his daughter play softball the night before. (Tr. at 435.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing Claimant's RFC because he failed to set out all of Claimant's limitations in a function-by-function assessment pursuant to SSR 96-8p. (Document No. 10 at 6-9.) Claimant cites to his testimony and the medical evidence, including treatment records from Dr. Garvey, Parkersburg Orthopedic, Dr. Nutter., and MRI reports, as well as Dr. Westfall's opinion, as evidence supporting his argument that additional exertional and non-exertional limitations are warranted by the record. (Id.) Claimant contends that the ALJ failed to discuss these limitations and posed an incomplete hypothetical question to the VE. (Id.)

In response, the Commissioner asserts that the ALJ's RFC assessment is supported by substantial evidence. (Document No. 16 at 17-22.) The Commissioner notes that Claimant received essentially conservative, ongoing treatment and the ALJ's RFC analysis was based upon the examination findings and test results of Drs. Nutter, Davis, Herriott, PAC Wilson and Gilliand, C-FNP Shanholtzer, and PAC Full, Dr. Dunn, as well as chiropractor and physical therapist records. (Id. at 17-18.) The Commissioner asserts that the ALJ's analysis satisfies the mandates of SSR 96-8p, and he need not describe the function-by-function analysis in his decision. (Id. at 18.) The Commissioner asserts that any problems Claimant had with cervical and lumbar spines and knees were amply accommodated by the ALJ's limitation to sedentary work. (Id. at 18-19.) The ALJ found that Claimant was not entirely credible, and therefore, did not accept his self-serving statements as entirely true. (Id. at 19-20.) Contrary to Claimant's assertion, the evidence did not establish that Claimant's physicians recommended knee replacement as necessary. (Id. at 21.) Accordingly, the Commissioner asserts that the record did not establish any limitations more than pushing and pulling

with the arms and hand controls as assessed by the ALJ. (<u>Id.</u> at 21-22.)

In Reply, Claimant asserts that an RFC should reflect a function-by-function assessment based upon the relevant evidence of an individual's ability to perform work-related activities. (Document No. 17 at 1.) Claimant asserts that he is not arguing that the ALJ should have accepted his serving limitations due to pain. (<u>Id.</u> at 2.) Rather, the ALJ should have included in his RFC assessment the limitations that accommodated the severe impairments recognized at step two, and which the medical evidence, when fairly considered, supports. (<u>Id.</u>)

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because the ALJ failed to accord any weight to the opinion of Claimant's treating chiropractor, Dr. Garvey. (Document No. 10 at 9-11.) Claimant asserts that the ALJ rejected his opinion as a non-acceptable medical source. (<u>Id.</u> at 11.) Claimant asserts however, that the ALJ should have been considered and an explanation given for how the medical evidence rebuts Dr. Garvey's opinions. (<u>Id.</u>) Furthermore, Claimant contends that the ALJ adopted the 2011, opinions of the state agency consultants, Dr. Lambrechts and Ms. Westfall, but failed to obtain an updated opinion after more than 140 pages of medical records were submitted after their opinions. (<u>Id.</u>)

In response, the Commissioner asserts that the ALJ gave no weight to Dr. Garvey's November 2010, opinion because he was not an acceptable medical source and because his opinion was not supported by his objective findings. (Document No. 16 at 22-23.) Thus, the ALJ gave two reasons for discrediting his opinion. (<u>Id.</u>) The Commissioner also notes that disability opinions are issues reserved to the Commissioner. (<u>Id.</u>)

In Reply, Claimant asserts that the reasons given by the ALJ for rejecting Dr. Garvey's opinion are contrary to the Commissioner's own rules and regulations. (Document No. 17 at 2.)

Finally, Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to follow the "slight abnormality" standard in finding that Claimant's mental impairments were non-severe. (Document No. 10 at 11-15.) He asserts that the ALJ found only mild limitations in the paragraph "B" findings, which directly conflict with Dr. Smith's opinion, who assessed moderate limitations in social functioning, concentration, persistence, and pace. (Id. at 13.) Furthermore, Dr. Smith assessed additional moderate functional limitations and opined that Claimant was limited to simple, unskilled work-like activities with limited contact with others. (Id.) Dr. Bartee affirmed Dr. Smith's opinions, yet the ALJ gave the opinions no weight because the evidence supported only mild limitations. (Id.) Claimant also asserts that the ALJ failed to consider Dr. Dunn's mental status examination findings, and the notes of difficulties with fatigue, depression, and sleep disturbances despite medication from Roane Family Health Care. (Id. at 13-14.) Claimant therefore, contends that his major depressive disorder and pain disorder caused more than a slight abnormality in his ability to perform basic work activities. (Id. at 15.)

In response, the Commissioner asserts that Claimant never sought care, treatment, or counseling from a mental health professional and no other health care professional referred him for such, either. (Document No. 16 at 23-25.) Although Claimant asserts that he was depressed, the Commissioner contends that such depression was situational related to his relationships and finances. (Id.) Regarding Dr. Dunn, the Commissioner asserts that Dr. Dunn specifically assessed only mild symptoms related to mental functioning and reported that his depression did not have a significant effect on his functioning. (Id.) Regarding Dr. Smith, the Commissioner asserts that the record demonstrates that she reached her conclusions primarily on Claimant's subjective reports in connection with his disability applications. (Id. at 24.) Furthermore, Claimant was not under the care

19

of a physician or taking medications when Dr. Smith rendered her opinion. (Id.) Accordingly, the Commissioner asserts that the ALJ's decision is supported by substantial evidence of record. (Id.)

In Reply, Claimant asserts that the Commissioner's *post hoc* rationale cannot substitute for the ALJ's own reasoning and cannot cure errors made by the ALJ. (Document No. 17 at 3.) He asserts that Dr. Smith's opinion was based on her reading of Dr. Dunn's consultative examination report, which had occurred days earlier, and Dr. Dunn's report was confirmed by Dr. Bartee. (Id.) In order to find that Claimant had a non-severe mental impairment, the ALJ had to reject all three of the psychological impairments of record and arrive at his conclusion based on his own lay analysis of the record. (Id.)

Analysis.

1. RFC Assessment.

Claimant first alleges that the ALJ erred in assessing his RFC because he failed to set out all of Claimant's limitations in a function-by-function assessment pursuant to SSR 96-8p. (Document No. 10 at 6-9.) . "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ

20

has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

In his decision, the ALJ determined that Claimant was limited to sedentary exertional level work, except he could not push or pull with the upper extremities. (Tr. at 15.) The ALJ acknowledged the evidence of record including Claimant's testimony, the medical record, and the opinion evidence. The ALJ summarized Claimant's testimony but found that it was not supported by the objective evidence of record. (Tr. at 16.) Specifically, the ALJ noted Dr. Nutter's report of consultative examination, as summarized above, and found that overall, Claimant functioned fairly well. (Tr. at 16-17.) Furthermore, despite the severity of Claimant's complaints of back pain, the ALJ noted that x-rays essentially were normal and inconsistent with his complaints. (Id. at 17.) PAC Full consistently observed a normal gait and stance, encouraged him to remain active, and gave him prescriptions for pain medications. (Id.) Similarly, Dr. Davis's back examinations were unremarkable and knee imaging revealed only mild degenerative changes with narrowing and spurring, and then later a chronic tear. (Tr. at 17-18.) Claimant received injections for his knees, which helped. (Tr. at 18.) Physical therapy notes revealed symptom magnification. (Id.) As the ALJ noted, his treatment was effective and conservative with medications, injections, and physical therapy. (Tr. at 19.) The evidence does not support severe restrictions in the ability to stand, walk, and sit as alleged by Claimant. (Id.)

The ALJ properly analyzed the evidence of record, considered the consultative report of Dr. Nutter, and the opinion of Dr. Lambrechts, who affirmed an earlier opinion finding that Claimant was limited to light exertional level work. (Tr. at 21.) Given Claimant's knee complaints however,

the ALJ gave Claimant the benefit of the doubt and gave Dr. Lambrechts' opinion little weight and reduced Claimant's RFC to sedentary exertion. The record establishes that his knee complaints were greater than his back complaints. Accordingly, the undersigned finds that the ALJ properly accounted for all of Claimant's credibly established functional limitations and properly assessed Claimant's RFC according to the regulations.

2. Chiropractor Opinion.

Claimant next alleges that the ALJ erred in failing to accord any weight to the opinion of his treating chiropractor, Dr. Garvey. (Document No. 10 at 9-11.) The Regulations require that ALJs consider all evidence from "acceptable medical sources" including chiropractors and other providers. 20 C.F.R § 404.1513(a). Chiropractors are not "accepted medical sources" but qualify as "other sources" under 20 C.F.R. § 404.1513(d)(1)("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include . . . chiropractors. . ..") The rules for evaluating acceptable medical source statements and opinions do not apply, therefore, to statements and opinions of physicians' assistants. ALJs may consider any opinions of physicians' assistants as additional evidence, but they are not required to assign them weight, controlling or otherwise, in their evaluations of evidence. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996); Yost v. Barnhart, 79 Fed.Appx. 553, 555 (4th Cir. 2003)(affirming District Judge Chambers' denial of benefits and finding no error in the ALJ's rejection of the opinion of a physical therapist respecting the claimant's physical impairments.). In some instances, the other source's opinions may weigh greater than the opinions of acceptable sources, where there is a great treatment record that demonstrates that the other source essentially was a treating source.

22

That however is not the case in this matter. Dr. Garvey provided chiropractic treatment to Claimant from June 2010, through October 2010, and his treatment notes consisted of statements that revealed little as to Claimant's progress. (Tr. at 247-52, 371.)

In his decision, the ALJ noted Dr. Garvey's opinion that Claimant was unable to lift more than ten pounds and was unable to bend or reach out. (Tr. at 20.) The ALJ, however, gave no weight to Dr. Garvey's opinion because as a chiropractor, Dr. Garvey was an unacceptable medical source. (Id.) The undersigned finds that the ALJ made a proper determination pursuant to the Regulations. The ALJ also gave no weight to Dr. Garvey's opinion because he failed to support his opinion with objective findings as to the length of Claimant's disability. (Id.) Dr. Garvey fails to state any objective bases in support of his opinion. (Tr. at 371.) Other than the fact that he was a treating chiropractor, Claimant has offered no other reason why the ALJ should not have rejected his opinion. Accordingly, the undersigned finds that the reasons stated by the ALJ are supported by the Regulations and the evidence of record.

3. Mental Impairments.

Finally, Claimant alleges that the ALJ erred in failing to follow the "slight abnormality" standard in finding that Claimant's mental impairments were non-severe. (Document No. 10 at 11-15.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2012). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work

situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."); SSR 96-3p (An impairment "is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In his decision, the ALJ found that Claimant's major depressive disorder and pain disorder associated with both psychological factors and a general medical condition, did not cause more than minimal limitations in his ability to perform basic work activities, and therefore, were nonsevere. (Tr. at 14.) In reaching this conclusion, the ALJ specifically noted Dr. Dunn's consultative examination. (Id.) The ALJ further found that Claimant had mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, or pace and had no episodes of decompensation of extended duration. (Id.) These assessments were consistent with those found by

the examining evaluator, Dr. Dunn, who also assessed a GAF of 65, which was indicative of only mild symptoms. The ALJ rejected Dr. Smith's moderate limitations in social functioning, concentration, persistence, and pace, as they were not accepted by the record. Claimant's depression essentially was situational and managed with medication. (Tr. at 19.) Claimant was able to function and desired to return to work. (Tr. at 20.) He reported that he ran errands with his wife, picked up toys, went hunting, and exercised regularly. (Id.) Thus, nothing in the record supports any severe mental impairments or significant functional limitations resulting from Claimant's mental impairments. Accordingly, the undersigned finds that the ALJ's step two and RFC findings respecting Claimant's mental impairments are supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 16.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 27, 2015.

R. Clarke VanDervort
United States Magistrate Judge